UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
TEXAS DIVISION

| | | |
|---|---|---|
| RASLYN COBBIN-WOOTEN | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.:_____ |
| | § | |
| INVESCO LTD, INVESCO INC., | § | |
| and INVESCO ADVISORS, INC. | § | |
| | § | |
| *Defendants.* | § | |

## COMPLAINT

Plaintiff Raslyn Cobbin-Wooten files this Original Complaint against Invesco Ltd., Invesco Inc., and Invesco Advisors, Inc. (collectively "Defendants" or "Invesco") for racial discrimination, retaliation, and violation of the Family Medical Leave Act.

## I.

## INTRODUCTION

1.      Raslyn, a media professional and company director, notified her employer, Invesco, that she was being discriminated against because she was black.  Instead of investigating or addressing her concerns directly, Invesco responded by reducing Raslyn's visibility and fabricating a series of false "performance" evaluations and reviews.  Invesco ultimately used these false performance evaluations as a pretext to fire her.

2.      Before she was fired, Raslyn requested an internal investigation into her charges of racial discrimination in writing, as required by Invesco's handbook. Invesco did not share information regarding or confirm whether an investigation was conducted.

3.      After being denied meaningful information, and before she was terminated, Raslyn filed a charge of racial discrimination against Invesco with the Equal Opportunity Employment

Commission ("EEOC").  Invesco responded to Raslyn's EEOC charge with more retaliation.  First, Invesco's Human Resources Department ("HR") met with Raslyn and told her to settle and end her EEOC claim without consulting her lawyers.  Second, despite the fact that Invesco filed a series of "performance improvement plans" related to Raslyn's work performance, Invesco's HR representative conceded that Raslyn did *not* have work-based performance issues.  Third, after she notified Invesco of racial discrimination, the HR Department told her that "nothing would change" and strongly implied that she resign or be fired.

4.      Raslyn declined to withdraw her EEOC charge or to resign.  On September 28, 2018, Invesco fired her.

5.      These are just some of the examples and evidence that illustrate an environment of discrimination and harassment at Invesco; a culture of intimidation, systemic racism, and retaliation.  Raslyn files this suit against Invesco to hold it accountable for racial discrimination, retaliation, and violations of the Family Medical Leave Act ("FMLA").

## II.

### THE PARTIES

6.      Plaintiff Raslyn Cobbin-Wooten is an individual who resides in Houston, Harris County, Texas.

7.      Defendant Invesco Ltd. is a foreign limited liability company doing business in the State of Texas and does not have a registered agent.  It may be served by and through the Secretary of State.

8.      Defendant Invesco Inc. doing business in the State of Texas and does not have a registered agent.  It may be served by and through the Secretary of State.

9.     Defendant Invesco Advisors, Inc. is a Texas corporation registered to do business in the State of Texas and may be served with process by and through its registered agent: CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, Texas 75201-3136.

### III.

### JURISDICTION

10.     The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1343 because the claims arise under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 2000e *et seq.*) and 42 U.S.C. § 1981.

11.     Invesco is, and was at all relevant times, an employer in Houston, Harris County, Texas and engaged in an industry or enterprise affecting interstate commerce.

### IV.

### VENUE

12.     Venue of this action is governed by 42 U.S.C. §2000e-5(f)(3) and is proper in the Southern District of Texas because Plaintiff was discriminated against by Invesco in Houston, Texas, and the incidents giving rise to this lawsuit occurred in Houston, Texas.

### V.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.     On June 20, 2018, Raslyn timely filed a Charge of Discrimination with the EEOC and TWC – Civil Rights Division.  The EEOC issued its "Notice of Rights to Sue (Issued on Request)" (the "Notice") on April 14, 2019.  *See* Exh. "A."

14.     It has been less than 90 days since Raslyn received the Notice and more than 180 days since Raslyn filed the Charges with the TWC – Civil Rights Division.

# VI.

# FACTUAL BACKGROUND

15.     Raslyn is a widow and single parent who built a professional career in marketing, public relations and media.  Born in Minneapolis, Minnesota, Raslyn attended Howard University in Washington, D.C.  When her mother moved to Australia, Raslyn transferred to Charles Sturt University in Australia, where she received a B.A. in Communications, Broadcast Journalism and Global Politics.  Her husband died suddenly of heart failure when her son was 5-years old.  For the last decade, Raslyn raised her son alone and worked in marketing and communications.

**A.  In her role as Director of Media Relations, Raslyn outperformed her predecessors and contemporaries at Invesco.**

16.     Invesco hired Raslyn as a Media Relations Director in August 2015 to support the Houston investment professionals.  Invesco is a conservative, southern-based financial company with an international presence.  Invesco sells investment products to retail customers, institutional investors and third-party financial advisors.  The company has more than 7,000 employees in 20 countries and manages over $975 billion in assets.  Despite its size, Invesco is relatively unsophisticated in media relations.

17.     As a Director, Raslyn's job was to design and execute media relations strategies for active investment professionals and develop media relationships on Invesco's behalf.  Raslyn was tasked with creating brand awareness, generating media coverage, and securing conference attendance and speaking opportunities for Invesco's asset managers.  Raslyn's responsibilities included "creating content," or writing blogs, articles, biographies, and interview notes related to active investment professionals.  She worked to arrange interviews with well-known media outlets, including The Wall Street Journal, CNBC, Bloomberg, and the Financial Times.

18.     Raslyn used her strong relationships with members of the media to build a media

presence for Invesco.  As the only Media Relations Employee working from Houston, Texas, Raslyn brought to Invesco a contact list of hundreds of media reporters, hosts and producers, most of whom had never worked with Invesco.

19.     Initially, Raslyn was only responsible for Invesco's Equities ("IFE") team in Houston.  That quickly changed.  Less than three months after being hired, Invesco asked Raslyn to work with additional teams inside the company to fill-in for a media relations director who had been fired. This was supposed to be temporary due to a company-wide hiring freeze. Her internal "clients" included Invesco's Senior Managing Director (SMD) of Investments, and other Invesco employees in the company, including employees in following divisions:  Invesco Global Fixed Income ("IFI"), IFE, Commodities, Retirement, Defined Contributions, Invesco Consulting, College Savings (529), Invesco Advisors, and Solutions.

20.      These teams were located in Houston, Austin, Louisville, Tampa, New York, Atlanta and the United Kingdom.  By 2016 and until she was fired in September 2018, Raslyn was responsible for media related to more than 35 investment professionals in the United States and United Kingdom, along with their supporting teams without a title or pay increase. This was previously the workload of two media relations directors and their supervisor.

21.     Because Raslyn supported these internal teams, she also supported hundreds of funds that were managed by these teams.  For example, one investor supported by Raslyn might have five different funds.  Raslyn was thus required to be fully informed and up to date on all fund performances and other companies, countries, and assets within those funds.  This required her to work long hours and at home, often starting before 5 a.m.  While Raslyn accepted her role, Terrio and Raslyn's counterparts often took time off during the middle of a business day to run personal errands like having makeup done at Sephora.

22.     Raslyn's 2016 job performance surpassed both of Invesco's previous Media Relations Directors.  In 2016, Raslyn arranged for more than 400 interviews for an intra-company division, IFI.  In comparison, prior to her arrival, Invesco conducted somewhere in the range of 20 interviews for the entire IFI team.

23.     Invesco acknowledged Raslyn's value within the company, and stated that "Raslyn continues to build momentum" and praised "all the great work she had been doing to get our investment teams media coverage."  Some of Raslyn's achievements that were "firsts" at Invesco include:

- Raslyn secured funding and budget from all of her internal business partners for all of her investment teams (Solutions, IFE, IFI, and Retirement);

- She was the first Media Relations Director to provide media training to the entire IFI team and many of their supporting teams;

- She secured over 400 interviews for the investment teams;

- She was the first Media Relations member to have regularly scheduled meetings with Invesco's product management, sales and brand marketing teams;

- She was the only Media Relations member invited to participate in Invesco's weekly CPM teleconference;

- She was the first Media Relations member to secure prominent features for IFI in the Financial Times (above the fold); and

- She secured two Barron's profiles for IFI and Commodities.

24.     Despite her success, in 2017 Invesco asked Raslyn to reduce the number of interviews for the teams that she supported because it surpassed that of her counterparts and supervisor.  Raslyn complied, limiting the interviews that she arranged to just over 300 for the year.

25.     Based on her results, Raslyn's immediate supervisor, Jeaneen Terrio, told her that

she would receive a promotion to Head of Investment Media Relations.  Instead, after Raslyn notified Invesco of its discriminatory practices, Terrio retaliated against Raslyn and worked to end her career at Invesco.

**B.  Invesco fosters a culture of systemic racism and discrimination against Raslyn and people of color.**

26.     From the beginning of her employment, Raslyn noticed a lack of diversity at Invesco and an atmosphere of racial discrimination against people of color, particularly against black women.  According to Graham Galt, the Head of Communications and the ultimate supervisor of Invesco's media relations, "diversity" was "just another word for lawsuit."  During her employment at Invesco, Raslyn was the only black woman Media Relations Director.  More broadly, Raslyn was one of only a handful of minority women at Invesco in management or senior level positions.

27.     Even during the hiring interview process, Invesco treated Raslyn differently and less favorably than her white counterparts.  For example, Raslyn's interview process for the Media Relations role was more rigorous than similarly situated employees.  Raslyn was required to interview with approximately seven different people at Invesco before being offered a position, while her counterpart interviewed with only three people for the same title and position.

28.     After another media relations director was hired in New York, Raslyn noticed that Invesco continued to give her a disproportionate amount of the workload compared to her counterpart.  Raslyn supported more than 35 Invesco spokespeople.  Her counterpart in the media department, however, supported three people.  In addition to her direct responsibilities, Invesco required Raslyn to "back-up" other members and take on additional duties and responsibilities.  However, whenever Raslyn was not in the office, she was expected to complete her work, was wrongly criticized about her timeliness, and received no "back-up" from other employees.  For

example, Raslyn was required to complete her day-to-day tasks while attending conferences as an Invesco representative—with no backup help or support.

29.     Invesco's disproportionate treatment of Raslyn included arbitrarily changing her performance targets. For example, in 2016 Invesco added its IFI team to Raslyn's workload and told her to focus solely on that team.  Just weeks later, however, her supervisor chastised Raslyn for not providing a media plan for a different Invesco team—even though Raslyn was never instructed to create the plan in the first place.  Being a team player, Raslyn began formulating the media plan and scheduled training for the Invesco team in question—only to have her supervisor arbitrarily cancel the plan and training.

30.     Despite receiving accolades and positive feedback from colleagues, Raslyn was told that she needed to learn to be part of the company "culture."  This "culture" tolerated and allowed a white male investor, upon first meeting her, to ask her "what is your background," "how did you get this position," and a white woman assistant to comment "that's a big job for you." This "culture" also allowed a white male investor to refuse to call her by her name and instead called her "Rosalind." He stated in front of a group of colleagues that he didn't like her name because it wasn't "sophisticated."    He went on to say "who names their daughter Razzzzlyn anyway, I mean what kind of name is that?"  When Raslyn asked him if he was calling her name "ghetto" he shrugged his shoulders.  The implication was her name was too ethnic and outside Invesco's norm.

**C. Raslyn reports racial discrimination and Invesco retaliates by fabricating alleged performance issues.**

31.     Despite these red flags, Raslyn's 2016 job performance easily surpassed the previous two Invesco Media Relations Directors.  Nonetheless, Raslyn still felt she was being discriminated against and could achieve more for Invesco.

32.     In the fall of 2016, Raslyn reported to HR that she was being unfairly treated and racially discriminated against by her supervisor and peers, including Terrio.  Raslyn also told Tara Patterson, her HR Business Partner about the differences in treatment of people of color compared to Anglos at Invesco.

33.     In July 2017, Raslyn travelled to Invesco's office in New York City.  Raslyn was in New York for a week to attend meetings, including with her direct supervisor, Terrio.  Near the end of the week, after a day of meetings, Raslyn and Terrio hailed a yellow cab outside Invesco's offices on their way to a business networking dinner.  When they were alone in the cab, Raslyn raised her concerns about racism in Invesco's culture.  Raslyn told Terrio that she believed that she was being discriminated against and targeted by Invesco employees because she was a black woman.  Raslyn expressed concerns that she was being forced to reduce the number of interviews and speaking opportunities for black investment professionals or to remove them from the spokesperson list altogether.  She told Terrio that the distribution of work between her and her white colleagues was unequal and disproportionate.  She pointed out that Terrio treated her less favorably than her white counterparts and raised the concern that Terrio was undermining her in professional settings.  Raslyn asked Terrio if she was aware of these and other issues, and she asked for Terrio's help in addressing the discrimination.

34.     Terrio became hysterical, raising her voice and telling Raslyn that she felt attacked. Terrio blamed her supervisor, Graham Galt, for how Raslyn was treated and painted herself as a victim that was following Galt's lead.  Terrio and Raslyn exited the cab and Terrio refused to go to dinner with Raslyn.

35.     After this incident in New York, Terrio began to directly retaliate against Raslyn. Terrio told Raslyn in a telephone call that she was not going to act on Raslyn's discrimination

claim. Terrio started imposing different "rules" on Raslyn than she imposed on Raslyn's counterparts. For example, Terrio required Raslyn to submit a 2018 media plan in August 2017. In the past, however, media plans were not due at Invesco until each year in January. Terrio demanded that Raslyn complete the plan in a month—even though Raslyn's white counterparts were given until January 2018 to submit their media plans. Raslyn was also required to be present during all media interviews she arranged for all 35 plus financial advisors—but her counterparts were not.

36.     Terrio started to arbitrarily change Raslyn's workload and to create requirements that applied to only her and not her colleagues. If meetings were scheduled that should have included Raslyn, Terrio would often end the meetings early, cancel or decline the meetings altogether. Raslyn was also excluded from meetings or calls that she previously participated in before telling Terrio of her concerns about discrimination. Terrio began creating performance expectations for Raslyn that she privately admitted were impossible to achieve.

37.     In November 2017, Raslyn followed up her 2016 report to HR by requesting a meeting with Invesco's HR Department, and Tara Patterson, to discuss these issues. Patterson ignored Raslyn's request.

38.     In response to Terrio's retaliation and being ignored by HR, Raslyn told the Senior Managing Director ("SMD") of Investments that she felt discriminated and retaliated against by Terrio and others at Invesco. She asked for a different role within the company. He suggested that Raslyn schedule a meeting with Terrio's supervisor, Graham Galt. On November 17, 2017, Raslyn sent Galt an e-mail requesting a meeting. Galt initially accepted, but then cancelled hours before the meeting. He continued to cancel each time Raslyn attempted to reschedule the meeting and ultimately refused to discuss her concerns.

**D.  Invesco retaliates against Raslyn by fabricating "performance issues" as a pretext to terminating her.**

39.     On January 25, 2018, Raslyn met with HR's Tara Patterson.  Raslyn again notified Patterson that she was being discriminated against and asked for help in addressing her concerns. Patterson took copious notes but did nothing.

40.     Later that afternoon, Raslyn received notice that Invesco was subjecting her to a "performance improvement plan" or "PIP."  A PIP is a formal procedure in which an employee's job performance is placed under review.  If the employee's "performance" is not "improved" under the "plan," s/he is likely to be fired.

41.     Prior to that moment, Invesco had never notified Raslyn that her "work performance" required the institution of a formal disciplinary process.[1]  In fact, Raslyn received her bonus for that year, which is typically withheld at Invesco when there are performance issues. The PIP was instituted by Terrio and based on alleged incidents that occurred some two years earlier, in 2015.  The allegations in the PIP were incorrect, false, and a pretext for unlawful retaliation and discrimination.

42.     Raslyn provided a written response to the allegations in the PIP, detailing the inaccuracies and asking for concrete benchmarks to address the alleged performance issues. Raslyn noted that the PIP lacked specific examples of her alleged performance issues; it provided no "plan" or metrics to gauge her future performance; and thus was vague and unworkable. Invesco declined to reply to Raslyn's letter and never provided her with benchmarks, metrics, or concrete steps that she could take to "improve" her performance and be released from the PIP.

---

[1] As described, below, Raslyn would receive three other written "performance" based documents: (*i*) a document titled "Moving Forward" (May 2018); (*ii*) a document titled, "Topics for Weekly Calls (May 2018); and (*iii*) a document titled, "Performance Improvement Plan Final Written Warning (September 2018).

43.     Instead, on February 20, 2018, Terrio asked to meet Raslyn for dinner in Houston, Texas.  Terrio confessed that her criticisms were false and the PIP should not have been issued. Terrio apologized for starting the PIP process and said that she was "brainwashed" by her supervisor, Graham Galt.  Terrio called herself a "psycho" and said that Invesco was a "crazy place."  She appeared to blame Galt for subjecting Raslyn to the PIP and told Raslyn that she was doing a great job and was held in high regard by her and Invesco.  Raslyn left dinner feeling reassured and certain that the PIP would be discontinued. Terrio told Raslyn that the meeting with HR the next day was a "formality to get Galt off her (Terrio's) back."

44.     That was not the case.  The next day everything changed.  On February 21, 2018, Terrio and Patterson met with Raslyn and, to Raslyn's surprise, Terrio denied their conversation of the night before at dinner.  Terrio told Raslyn that the PIP would remain in place.  She said that Invesco had "a unique culture."  According to Terrio, the "real question" was not racism, but rather whether Raslyn could "fit in."  Raslyn felt betrayed and was left with the impression that she would be fired unless she dropped her discrimination claims.

**E.  Invesco violates the Family Medical Leave Act**

45.     Invesco's discrimination and retaliation against Raslyn, including the abrupt and irrational change in Terrio's statements between February 20 and 21, 2018, caused Raslyn to fear her career was in jeopardy.  Raslyn questioned how she would provide for her son.  Already under professional care for stress, depression, insomnia, and anxiety, the bizarre meeting with Terrio and Patterson was too much.  Raslyn's doctor told her to take leave under the Family Medical Leave Act ("FMLA") for health reasons.

46.     Raslyn started leave under the FMLA on February 21.  She returned to Invesco less than two months later on May 14, 2018.

47.     Despite the legal protections afforded under the FMLA, it became apparent Invesco did not expect or want her to return.  Although Rarick sent Raslyn an e-mail saying he was looking forward to her return, on her first day back Raslyn's Invesco badge did not allow her access to the office, as it does for all other Invesco employees.  None of Raslyn's co-workers and office-mates knew that she was returning to Invesco.  Invesco removed Raslyn's access to e-mail, telephones, and the IT network.  Invesco removed Raslyn's headset and computer monitors from her office. Even after she returned, Invesco did not circulate a notice informing other employees that Raslyn had returned to work or welcoming her back to Invesco. Through several colleagues, Raslyn was made aware that Terrio was listening to her phone conversations and voicemails and Terrio was receiving blind copies of all of Raslyn's emails. Even after Raslyn had Invesco's IT remove these infringements, Terrio reinstated her ability to receive all of Raslyn's emails.  Once colleagues noticed this, they became uncomfortable communicating with Raslyn.

48.     Within days of her returning in May 2018, Invesco gave Raslyn a second "performance" document entitled "Moving Forward."  In this document, Invesco changed the terms and conditions of Raslyn's employment.

49.     In May 2018, Raslyn received a third "performance" document, titled "Topics for Weekly Calls."  This document stated that Raslyn was no longer allowed to work from home; Invesco required her to be in the office from 8 a.m. to 5 p.m. without exception.  She was only allowed to work remotely on Fridays, and not at her discretion (as she previously did).  Because of these newly instituted restrictions, Raslyn could not pick her son up from school.  The document listed tasks that she was told to complete, even though Terrio and Richard "Rick" Rarick, Invesco's Head of Human Resources, Americas eventually admitted that they were impossible to finish.

50.     Rarick informed Raslyn the PIP was no longer relevant and was "in the past."

However, she was now subject to the restrictions stated in the "Moving Forward" and "Topics for Weekly Calls" documents.  At that point, Raslyn had been subjected to the PIP since January 25, 2018.  According to the PIP document it was to last 90 days.  Whenever Raslyn asked Rarick or Terrio when she was going to be finished with the PIP, she was told it was "at her manager's discretion"—even though the Invesco handbook requires an end date.  Rarick's statement that the PIP was "in the past" was not comforting because it was never "ended" in writing and Raslyn was now subject to the strictures stated in the document titled "Moving Forward" and weekly telephone calls with both Rarick and Terrio.

51.     More troubling, after Raslyn returned in May 2018, Invesco did not reinstate the same job duties or requirements that Raslyn had before going on leave under the FMLA but instead placed her in a demoted position.  For example, Raslyn's primary role at Invesco was to create and implement a media plan for the SMD of Investments and all of the active investment teams.  After she returned from leave, Invesco stripped her of that duty.

52.     Although her job title remained the same, Invesco instituted restrictions on Raslyn's job duties to the point that her position was not recognizable as a director position.  Instead, Invesco instituted restrictions on how Raslyn conducted her job duties.  Invesco largely stripped Raslyn of any discretion and independence in performing her job.  Invesco required Raslyn to provide daily and weekly updates on her activities and was subjected to a weekly "monitoring" call with the HR Department.  Her work and communications now had to be approved and reviewed prior to implementation.  Invesco also reduced Raslyn's visibility within Invesco and with others.  For example, she had limited access to, and interactions with her business partners.  She was not allowed to travel, yet her white colleagues were.

53.     Terrio, for the first time ever, denied Raslyn's request for standard vacation time.

54.    Raslyn also was not allowed to travel for internal Invesco business but her white, male counterparts continued to have reimbursed travel.

55.    Even more troubling, Raslyn learned that while she was placed on a PIP, a white-male counterpart, working at a lower level in Invesco, was given an executive/career coach to address his so-called performance issues.  Invesco paid for the career coach in full for a year.  Raslyn was never offered a similar option.

56.    Invesco, and Terrio, knew that Raslyn is a widow and single mother.  Raslyn accepted her position as a Director with Invesco's agreement that she would have the schedule flexibility to take her son to and from school.  After Raslyn complained about racism and returned from FMLA, Terrio began scheduling meetings during school drive times and prohibited Raslyn from calling into the meetings and working at home at her discretion (as done previously) but allowed Raslyn's white counterparts to call in and work from home at their discretion.  Terrio also began micromanaging Raslyn by giving her contradictory directives and instructions.

57.    Invesco's newly instituted restrictions amounted to a demotion.  Raslyn told Invesco that these restrictions were discriminatory and retaliatory.  She communicated with Invesco's HR Department at least four times to discuss the retaliatory treatment.

58.    Despite Invesco's unlawful conduct and retaliation, Raslyn continued to perform her duties.  During this time period—and despite Invesco's efforts—Raslyn accomplished the following:

- She secured prominent media placements for Invesco in print and broadcast media;

- She arranged for Noelle Corum to be recognized as Atlanta's Power 30 under 30—something never accomplished previously by Invesco's media relations department.  Based on Raslyn's work, Corum received her first-ever television appearance and was later booked on Bloomberg Television on three separate occasions.

- Raslyn secured a first-ever guest appearance for Rahim Shad on TD Ameritrade Networks and had him featured in his first-ever national article in Institutional Investor.

- She booked Sean Newman to appear for the first time on Bloomberg Television's "Real Yield" and arranged for him to be featured in Institutional Investor; and

- She arranged for Mike Hyman to be featured in a Bloomberg Brief Q&A article.

**F.   Invesco further retaliates against Raslyn by using the PIP as a pretext to fire her.**

59.     To document Invesco's continued unlawful conduct, Raslyn submitted another written complaint to Invesco after returning from leave on May 22, 2018.  Despite her efforts to seek help, the HR Department did not intervene, and Invesco's retaliation worsened.

60.     In June 2018, Raslyn met with Rarick at his request.  Rarick is Tara Patterson's supervisor in Invesco's HR Department.  Rarick told Raslyn that despite her complaints of discrimination, nothing would change.  Rarick reinforced Terrio's message that Raslyn needed to learn to accept Invesco's culture and be quiet.

61.     After the meeting ended, Raslyn filed a charge of discrimination with the EEOC on June 20, 2018.

62.     Invesco responded to Raslyn's EEOC charge with even more retaliation.  First, Rarick met with Raslyn in his office on June 25, 2018 and told her to settle her EEOC claim without consulting her lawyers.  Rarick told her that any negotiations relating to her EEOC claim would be done by him alone.  He conceded that Raslyn did not have performance-related issues, but nevertheless suggested that she should resign.  He also strongly suggested that Invesco conducted no real investigation into her discrimination claims.

63.     In September 2018, Invesco sent Raslyn a fourth document, titled "Performance

Improvement Plan Final Written Warning."  Clearly, Rarick's statement that the PIP was "in the past" was false.  During this time period, Invesco never provided Raslyn with concrete benchmarks that she could achieve to satisfy the PIP.

64.     That same month, Invesco posted Raslyn's position with a change of title from "Director" to "Head of Investment Media Relations and Publicity."

65.     Invesco fired Raslyn on September 28, 2018.  At the time she was fired, she had been on a PIP for a total of 247 days or 165 days excluding leave.  On information and belief, 165 days is the longest period of time that an Invesco employee has been subject to a PIP.  Invesco's stated reasons for firing her are false and nothing more than a pretext.  Raslyn was not fired for "performance issues," but instead she was fired because she claimed racial discrimination and because she sought the protections of the FMLA.

66.     Raslyn now files suit to hold Invesco accountable for its unlawful conduct.

## VI.

### COUNT ONE:

### RACE DISCRIMINATION AND RETALIATION UNDER TITLE VII, THE TCHRA, AND § 1981

#### *Race/Discrimination-Disparate Treatment*

67.     Plaintiff incorporates by reference the allegations stated in paragraphs 1 to 61.

68.     Raslyn is a member of a class protected under Title VII, the Texas Commission on Human Rights Act (the "TCHRA") (TEX. LAB. CODE § 21.051), and 42 U.S.C. § 1981 based on her race, African American/Black.

69.     Invesco discriminated against Raslyn in violation of Title VII, the TCHRA, and 42 U.S.C. § 1981 by treating her differently and less favorably than her non-African American co-workers.  More specifically, Raslyn was given a disproportionate amount of work compared to her

non-black co-workers, she received less support, was given less discretion, and was subject to more restrictions and higher performance expectations.   Although Raslyn reported the discriminatory treatment to her supervisors and Invesco's management, Invesco did nothing to remedy the situation.

### *(ii)     Retaliation*

70.     Raslyn reported the discriminatory practice to Invesco's management and to the EEOC.  Despite Raslyn's complaints regarding such an environment, Invesco took no action to remedy the discrimination.  After complaining about the discrimination, Raslyn was treated more poorly and less favorably than her co-works and was ultimately fired under false pretenses.

### *(iii)    Damages*

71.     As a direct and proximate result of Invesco's conduct, Raslyn suffered actual and compensatory damages, including, but not limited to, lost wages, loss of benefits and loss of enjoyment of life, including emotional pain, suffering, inconvenience, and mental anguish, in an amount within the jurisdictional limits of this Court.

72.     Raslyn will further show that Invesco's conduct was intentional and that Invesco acted with malice and/or reckless indifference entitling Raslyn to compensatory and punitive damages as allowed by Title VII, the TCHRA, and/or 42 U.S.C. § 1981.

### VII.

### COUNT TWO:

### FMLA DISCRIMINATION AND RETALIATION

73.     Plaintiff incorporates by reference the allegations stated in paragraphs 1 to 69.

74.     Invesco violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. §2601, et seq.  The FMLA entitles an eligible employee to take up to twelve (12) weeks of unpaid leave

during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform his or her job functions.  29 U.S.C. 2612(a)(1)(D).

75.     The FMLA provides that "any eligible employee who takes leave…shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position."  29 U.S.C. 2614(a)(1), 29 U.S.C. 2615(a)(1); 29 C.F.R. § 825.214.

76.     In February 2018, the weight of Invesco's discrimination and retaliation against Raslyn became too much.  Raslyn sought help from health care professionals for anxiety and stress.  After three visits to professionals in a six-week period, Raslyn filed for leave under the FMLA.

77.     Raslyn was approved for FMLA.  Raslyn was on leave until May 14, 2018.

78.     But, when she returned to Invesco, the situation had deteriorated even more.  She was not placed in an equivalent position.  The terms and condition of her employment were significantly altered.  She was basically demoted.

79.     The FMLA provides that is unlawful for an employer to interfere with, restrain or deny the exercise of, or the attempt to exercise, any right provided under the FMLA.  Specifically, an employer cannot discharge or otherwise discriminate against an individual for opposing any practice made unlawful under the FMLA.   29 U.S.C. §2615(s)(1),(2); 29 C.F.R. §825.220(s)(1),(2).

80.     Invesco violated the FMLA by interfering with, discriminating, retaliating against Raslyn's right to take FMLA leave by failing restore her position, discouraging her from taking leave, and terminating her.

81.     As a direct and proximate result of Invesco's actions, Raslyn is entitled to recover lost wages as well as the value of lost employment benefits.

82.     Because Invesco's actions were committed willfully and knowingly, Raslyn is entitled to recover liquidated damages equal to the sum of her lost wages and benefits.

**VII.**

**JURY DEMAND**

83.     Plaintiff demands that this Court empanel a lawful jury to hear this case.

**VIII.**

**PRAYER**

Plaintiff Raslyn Cobbin-Wooten prays that Invesco be cited to appear and answer, and that upon final hearing, Plaintiff have and recover from Invesco as follows:

a.     Actual damages within the jurisdictional limits of the Court;

b.     Back pay and front pay within the jurisdictional limits of the Court;

c.     Compensation for loss of employee benefits, including medical, dental, life, 401(k), pension, and retirement benefits;

d.     Compensatory damages for past and future pecuniary losses, emotional pain, suffering, and inconvenience;

e.     Punitive damages;

f.     Liquidated damage;

g.     Pre- and post-judgment interest at the highest rates allowed by law;

h.     All reasonable and necessary attorneys' fees as specified herein;

i.     All costs of court; and

j.     Such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted,

GREGOR CASSIDY PLLC

/s/ *Eric J. Cassidy*
Eric J. Cassidy

Texas Bar No. 24031807
Southern District Texas No. 30001
ecassidy@gcfirm.com
Thomas M. Gregor
Texas Bar No.  24032245
Southern District No. 32190
tgregor@gcfirm.com
Nellie Gomez Hooper
Texas Bar No. 00798711
Southern District Texas No. 21164
nhooper@gcfirm.com

BANK OF AMERICA CENTER
700 Louisiana Street, Suite 3950
Houston, Texas 77002
(832) 331-6778 (Direct)
(832) 390-2655 (fax)

**ATTORNEYS FOR PLAINTIFF**